WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| 4801 East Washington Street Holdings, LLC, acting by and through CWCapital Asset Management LLC, solely in its capacity as Special Servicer,<br><br>Plaintiffs,<br><br>v.<br><br>Breakwater Equity Partners LLC, et al.,<br><br>Defendants. | No. CV-13-01475-PHX-DGC<br><br>**ORDER** |

Plaintiff and two Defendants have filed separate motions for summary judgment. Docs. 184, 187, 192. The issues are fully briefed. The Court will grant Plaintiff's motion and deny Defendants' motions.[1]

**I.   Background.**

  **A.   The Parties and the Loan.**

Plaintiff is 4801 East Washington Street Holdings, LLC, a loan servicing company acting as successor in interest to Column Financial, Inc. ("Lender"). Doc. 191, ¶ 10. Defendants include Breakwater Equity Partners, LLC ("Breakwater"), a commercial loan workout consultant, and Thompson National Properties, LLC ("TNP"), a property management firm. Other named Defendants include several common owners and tenants

---

[1] Defendants' request for oral argument is denied. The issues are fully briefed, and the Court finds that oral argument will not aid in the resolution of this matter. *See* LR Civ. 7.2(f); Fed. R. Civ. P. 78(b).

in common (collectively, "Borrowers").

On July 13, 2005, Lender loaned $40 million (the "Loan") to Borrowers to purchase certain real property including 4801 East Washington Street, Phoenix, AZ 85034 (the "Property").  Doc. 192 at 2.[2]  The parties executed a Promissory Note (the "Note") secured by a Deed of Trust, Assignment of Leases and Rents ("ALR"), Security Agreement, and Fixture Filing.  Doc. 189, ¶¶ 4, 5.  A Cash Management Agreement ("CMA") was also executed.  *Id.*, ¶ 11.  Collectively, these documents are referred to as the "Loan Documents."

### B.   The Loan Documents.

The Note required Borrowers to make monthly installment payments.  Doc. 191-1 at 4 ("[p]rincipal and interest shall be due and payable thereafter in equal installments"). In the event of default, the Loan amount, including "all sums advanced or accrued hereunder or under any other Loan Document . . . shall, at the option of Lender and without notice to Borrower, at once become due and payable, and may be collected forthwith, whether or not there has been a prior demand for payment[.]"  *Id.* at 7.  An "Event of Default" occurs when "any sum payable under [the] Note is not paid on or before the date such payment is due[.]"  *Id.*

The Deed of Trust applied to "[a]ll cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Lender . . . including, without limitation, all funds now or hereafter on deposit in the Reserves[.]"  *Id.* at 18-19. It also applied to "all rents, issues, profits, bonus money, revenue, income, rights and other benefits . . . of the [Property]," including security deposits, as well as all "present and future funds[.]"  *Id.* at 20.  The Rents and Reserves were designated "as additional collateral security for the payment of the indebtedness secured hereby . . . intending such Assignment to create a present, absolute assignment to Lender of all current or future leases of all or any portion of the Property and Rents."  *Id.* at 36, 40, 52.  The parties

---

[2] When the Court cites to page numbers in documents filed in the docket (Doc.), the citation will be to numbers at the top of the page assigned by the Court's CM/ECF system, not to numbers at the bottom of the page as assigned in the original document.

stipulated that "(i) the [CMA] is one of the Loan Documents[,] (ii) the Lock Box Account shall be included within the Reserves[,] and (iii) during any Cash Trap Period (as defined in the [CMA]), the Cash Management Account and all other Accounts and Sub-Accounts . . . shall be included within the Reserves." *Id.* at 99.

The CMA established a "Lock Box Account" where Borrowers would deposit Rents for the Property, "and all amounts held therein" were "irrevocably pledged to the Lender as additional security for the Loan." *Id.* at 197. The Operating Account was created for the Borrowers and was to be under the "sole dominion and control of the Borrower[s]." *Id.* at 197-98. The CMA defined the "Cash Trap Period" to include the "period of time from the occurrence of an Event of Default . . . until such time as any and all Events of Default under the Loan Documents have been fully cured." *Id.* at 190.

The ALR assigned Lender "all deposits (whether for security or otherwise), rents . . . and income of every nature of and from the Property[.]" *Id.* at 176. This included the "immediate and continuing right to collect and receive the [Rents], whether now due or hereafter becoming due[.]" *Id.* Notwithstanding the assignment, the ALR granted a license to Borrowers to collect and retain Rents subject to an important limitation:

> Upon the occurrence of an Event of Default, the aforementioned license granted to [Borrowers] shall automatically terminate without notice to [Borrowers], and [Lender] may thereafter, without taking possession of the Property, demand, collect (by suit or otherwise), receive and give valid and sufficient receipts for any and all of the Rents[.]

*Id.* at 176.

### C. Defendants' Relationship with Borrowers.

In 2008, TNP began managing the Property on behalf of Borrowers under a Property Management Agreement. TNP would collect Rents and deposit them in the Operating Account. Doc. 189, ¶¶ 29, 33, 34. Rents deposited in the account were used to pay utilities, taxes, insurance, repairs, maintenance, and the monthly Loan payment for the Property. *Id.*, ¶ 37.

Apparently because the balance of the Loan was due in 2013, Borrowers entered into a Consulting Agreement with Breakwater in late 2012 for loan workout services.[3] *Id.*, ¶¶ 42, 43. The Consulting Agreement required Borrowers to pay Breakwater $390,000 plus $210,000 in estimated loan workout expenses. *Id.*, ¶ 44. TNP would forward payment to Breakwater from the Operating Account at the direction of Borrowers. *Id.*, ¶ 45. For its role in arranging the Consulting Agreement, TNP was paid a referral fee of 12.5% of Breakwater's fee, also paid from the Operating Account. *Id.*, ¶ 47. Borrowers executed an internal Workout Funding Agreement and Memorandum of Understanding governing TNP's transfer of Rents in the Operating Account to Breakwater. Doc. 193, ¶ 6.

On January 11, 2013, and apparently on the advice of Breakwater, Borrowers defaulted on the Loan. Doc. 189, ¶ 22. At the time, the Operating Account held sufficient Rents to make the monthly Loan payment. *Id.*, ¶ 58. Borrowers, however, directed TNP to permit the Loan default and to transfer Rents to Breakwater to pay its fee, as well as additional Rents to be held on behalf of Borrowers by Breakwater. *Id.*, ¶¶ 53-56; Doc. 185, ¶ 8. Breakwater agreed to indemnify TNP from any claims arising out of the transfer. Doc. 189, ¶¶ 65-69; Doc. 191-1 at 176-79. Indeed, Breakwater is paying the legal fees TNP has accrued thus far in this case in accordance with the indemnity agreement. Doc. 189, ¶ 70.

**D.   The Transfers.**

Between January 14 and April 19, 2013, at the direction of Borrowers, TNP made nine transfers of Rents from the Operating Account to Breakwater totaling $2,306,250 (*id.*, ¶¶ 72-82; Doc. 193, ¶ 9), and two transfers to its own account totaling $48,750 (Doc. 189, ¶¶ 77, 80), for a grand total of $2,355,000 (*id.*, ¶ 2). Except for its fee of $341,250 and $215,000 in expenses, Breakwater maintained the remaining Rents in segregated accounts for the benefit of Borrowers. *Id.*, ¶ 86; Doc. 193, ¶ 10. Over the

---

[3] A loan "workout" is the "act of restructuring or refinancing overdue loans." Black's Law Dictionary 1638 (8th ed. 2004).

- 4 -

course of the next year, the Rents were used to pay $158,014.64 of the Borrowers' legal fees. Doc. 193, ¶ 12.

### E. Plaintiff's Lawsuit.

Plaintiff filed this lawsuit on July 19, 2013. Doc. 1. On September 13, 2013, Plaintiff sold the Property in a non-judicial foreclosure and received one credit bid for $22,960,000. Doc. 189, ¶ 24, 25. On October 24, 2013, Plaintiff filed a second amended complaint alleging four counts: (1) conversion against Breakwater, TNP, and Borrowers; (2) fraudulent conveyance against Breakwater and Borrowers (in the alternative to conversion); (3) breach of contract against Borrowers; and (4) breach of contract against Guarantors. Doc. 118, ¶¶ 141-173. In August 2014, Plaintiff and Borrowers entered into a Settlement Agreement under which Borrowers transferred to Plaintiffs $1,750,000 of the funds remaining in the Breakwater accounts. Doc. 193, ¶ 13. The remaining $55,799.01 in the accounts was wired to Borrowers' legal counsel. *Id.*, ¶ 14. On September 2, 2014, the parties stipulated to dismissal of count four. Doc. 170.

## II. Legal Standard.

### A. Summary Judgment.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When presented with cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

### B.     Applicable Law.

As a threshold matter, Breakwater argues that California or Ohio law applies to Plaintiff's claims because TNP held the Rents in an Ohio bank account and transferred them to Breakwater's California bank account. The Court disagrees.[4]

"When a federal court sits in diversity, it must look to the *forum state's* choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) (emphasis added). Arizona is the forum state in this case and has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. *See Bates v. Super. Ct.*, 749 P.2d 1367, 1369 (Ariz. 1988); *Garcia v. Gen. Motors Corp.*, 990 P.2d 1069, 1075-76 (Ariz. Ct. App. 1999).[5]

Under § 145 of the Restatement, courts should consider "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145 (1971). The first three of these factors produce imprecise results in this case. Plaintiff is a Maryland LLC (Doc. 129), TNP is a Delaware LLC (Doc. 118, ¶ 3; Doc. 140, ¶ 3), and Breakwater is a citizen of California

---

[4] Breakwater asserts that both California law and Ohio law require an affirmative demand or "triggering" act for a claim of conversion. As explained below, Arizona law includes no such requirements. *See Pounders v. Enserch E&C, Inc.*, 306 P.3d 9, 11 (Ariz. 2013) (beginning conflict of laws analysis by identifying the conflict between the laws in question).

[5] No party analyzes Arizona choice of law rules. Breakwater asserts without explanation that California choice of law rules apply. Doc. 205 at 6 n.1. Plaintiff asserts that every agreement executed in connection with this case, including the Note, Deed of Trust, ALR, and CMA, contains an Arizona choice of law clause (Doc. 191-1 at 14, 87, 181, 208), but these documents were never executed by Breakwater or TNP.

- 6 -

(Doc. 166 at 1). What is more, Plaintiff did not substitute into this action until after the Loan default and trustee sale of the Property. Doc. 129. Prior to that time, the plaintiff (Wells Fargo) was a citizen of South Dakota. Doc. 159. As a result, the location of the injury and the place where the injury-causing conduct occurred are not easily ascertained, and the residences of the parties include Maryland, Delaware, California, and South Dakota. The first three factors of the § 145 test therefore provide little guidance on the state with the most significant relationship.

The fourth factor is more helpful. The relationship of the parties appears clearly to have been centered in Arizona. The Property financed by the Loan is located in Arizona, TNP's management concerned the Property in Arizona, the source of the Rents was the Property located in Arizona, and Arizona was the location of the trustee sale of the Property.

The Restatement also requires a court to consider the factors identified in § 6. Section 6 notes that statutes often determine how broadly a state's law is to be applied. In the absence of a such a statute (there is none in Arizona), § 6 directs courts to consider the needs of the interstate system, the policies of the forum, the policies of other interested states, the protection of justified expectations, the policies underlying the relevant field of law, uniformity of result, and ease in determination of application of the law to be applied. Restatement (Second) of Conflict of Laws § 6. These factors point to Arizona. The tort of conversion is designed to protect legitimate property interests. The Arizona law of conversion would have the same purpose for property located in Arizona. The Arizona law on fraudulent conveyances similarly seeks to protect legitimate interests in Arizona property. In this case, the relevant property interests concern Rents derived from the lease of Arizona property. The other potentially interested states – Maryland, Delaware, California, South Dakota, and Ohio (a source of law suggested by Breakwater) – have no particular interest in the Property, the Rents, or conversion of the Rents. In addition, the law of Arizona is easily determined and will produce a uniform result.

Considering all of the factors identified in §§ 145 and 6, the Court concludes that

Arizona has the most significant relationship to the matters at issue in this case. The Court accordingly will apply Arizona law.[6]

### III. Analysis.

Plaintiff seeks to recover from TNP and Breakwater $605,000 in Rents transferred to Breakwater by TNP. All parties move for summary judgment on the conversion claim. Breakwater also seeks summary judgment on Plaintiff's fraudulent conveyance claim.

#### A. Conversion.

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen*, 104 P.3d 193, 203 (Ariz. Ct. App. 2005) (citing Restatement (Second) of Torts § 222A(1) (1965)). In evaluating the seriousness of the interference, courts look to (1) the extent and duration of the exercise of dominion or control, (2) the intent to assert a right inconsistent with that of the other party's right of control, (3) any harm done to the chattel, (4) the extent and duration of the resulting interference, and (5) inconvenience to the other party. *Focal Point, Inc. v. U-Haul Co. of Arizona, Inc.*, 746 P.2d 488, 490 (Ariz. Ct. App. 1986) (citing Restatement (Second) of Torts § 222A(2)). Arizona has declined to adopt good faith as a relevant factor. *Id.* at n.3.

"To maintain an action for conversion, a plaintiff must have had the right to immediate possession of the personal property at the time of the alleged conversion." *Case Corp. v. Gehrke*, 91 P.3d 362, 365 (Ariz. Ct. App. 2004). "[M]oney can be the subject of a conversion claim if the money 'can be described, identified or segregated, and an obligation to treat it in a specific manner is established.'" *Id.* The defendant must intend "to exercise a dominion or control over the goods which is in fact inconsistent

---

[6] Restatement § 146 provides that the law of the state where the injury occurred should be applied unless another state has a more significant relationship. As noted above, the location of the injury in this case cannot easily be determined. The most likely location, if one had to be determined, would be South Dakota, the domicile of the original plaintiff (Wells Fargo). But Arizona clearly has a more significant relationship to the events in this case than South Dakota, so the rule in § 146 does not control.

- 8 -

1   with the plaintiff's rights." *Miller*, 104 P.3d at 203 (internal quotations omitted).

2   Plaintiff claims that conversion occurred in this case when TNP transferred the
3   Rents to Breakwater at the direction of Borrowers and when Breakwater exercised
4   control over the Rents in its bank accounts. Doc. 118, ¶ 142. Defendants maintain that
5   the Rents were the Borrowers' property, not Plaintiff's, and that Defendants acted only at
6   the Borrowers' direction.

### 1.    Immediate Possession.

"A secured party has the right to take possession of the collateral upon default, and so has sufficient possessory interest to bring a conversion action in those circumstances." *Gehrke*, 91 P.3d at 365, *see also Dayka & Hackett, LLC v. Del Monte Fresh Produce N.A.*, 269 P.3d 709, 715 (Ariz. Ct. App. 2012) ("Because a secured party has a right to take possession of collateral on default, its possessory interest is sufficient to maintain an action for conversion."). It is undisputed that Plaintiff is a secured party that acquired all rights under the Loan Documents as successor in interest to the Lender, and therefore had the right to possession of the collateral upon a default. It is also undisputed that the Borrowers' failure to make the January Loan installment constituted an Event of Default.[7]

In *Gehrke*, the Arizona Court of Appeals addressed whether proceeds from collateral are subject to an action for conversion. The defendant in *Gehrke* obtained equipment from the plaintiff, on credit, for the purpose of selling that equipment in the defendant's equipment-supply business. The plaintiff retained a security interest in the equipment and in the proceeds from its sale. 91 P.3d at 363-64. When the defendant failed to make payments and filed for bankruptcy, the plaintiff sued for conversion of the money the defendant received for the equipment. *Id.* at 364. The court of appeals held

---

[7] As noted above, Plaintiff was substituted into this case after the trustee sale of the Property. The former plaintiff represented that Plaintiff was the real party in interest under Federal Rule of Civil Procedure 17(a), having acquired the Loan and all related documents and rights. Doc. 129. TNP and Breakwater did not oppose the substitution (Doc. 138 at 2) and do not now dispute that Plaintiff has succeeded to all rights at issue in this lawsuit. For clarity and convenience, the Court refers to Plaintiff in this order as though it were in place at the time of the Loan default and later events.

- 9 -

1 that because the plaintiff had a security interest in the proceeds and the contract required that the proceeds be transferred to the plaintiff within seven days of the equipment sale, "[o]n the eighth day after the sale, if the funds were not deposited and transferred, [the defendant] had defaulted on the agreement and [the plaintiff] had the right to immediate possession of the equipment or the proceeds." *Id.* at 366. Therefore, the plaintiff had a viable claim for conversion of the proceeds. *Id.* at 368.

As in *Gehrke*, the Loan Documents granted Plaintiff a security interest in all Rents and Reserves, including those contained in the Operating Account, and Plaintiff had a right to immediate possession after default. The default triggered three events. First, under the ALR, Borrowers' license to collect and retain Rents terminated and the Rents became Plaintiff's property, to which it had a right of immediate possession. Doc. 191-1 at 176. Second, a Cash-Trap Period was triggered during which all accounts, including the Operating Account, became part of the Reserves, and the Rents contained therein could be setoff against the outstanding Loan amount. Third, Plaintiff could exercise any remedies under the Deed of Trust, including acceleration of the outstanding amount of the Loan and the right to apply any cash to the Loan amount.[8] Like the plaintiff in *Gehrke*, Plaintiff had the right to immediate possession of the Rents and therefore may maintain a claim for conversion. *See Gehrke*, 91 P.3d at 365.

Defendants assert that Plaintiff did not "create or hold" the accounts into which the Rents were deposited and therefore did not have a property interest in the Rents. Doc. 205 at 11. The Court disagrees. The Deed of Trust does grant Plaintiff a security interest in all accounts "now or hereafter created or held by Lender" (Doc. 191-1 at 18-19), but Defendants fail to quote the second part of this provision: "including, without limitation, all funds now or *hereafter on deposit in the Reserves*" (*id.* at 19 (emphasis

---

[8] The Deed of Trust provides that "[u]pon the occurrence of an Event of Default, Lender shall be entitled to exercise any and all of the remedies provided in this Deed of Trust" such as acceleration of the indebtedness "without any presentment, demand, protest, notice or action of any kind[.]" Doc. 191-1 at 40, 77. The Deed of Trust also provided Lender the right to setoff any cash of the Property against the outstanding amount of the Loan. *Id.* at 78.

- 10 -

1  added)).  This language grants Plaintiff a security interest in all cash funds in the
2  Reserves, which included the Operating Account containing the Rents.[9]  Even if the
3  Court were to read the provision narrowly, it is undisputed that Plaintiff had a security
4  interest in all Rents generally, and once the Loan was in default Plaintiff could recover all
5  Rents in the Reserve accounts under the ALR.  Doc. 191-1 at 20, 176.

6  In support of its contention that the Rents were Borrowers' property, Breakwater
7  asserts that "[s]o long as [Borrowers] serviced the debt, [they] could have written
8  themselves an end-of-year bonus of $1,088,158.52 on December 31, 2012."  Doc. 205 at
9  11.  But Borrowers did not continue to service the debt.  They defaulted, and thereby lost
10 the right to collect and retain Rents or pay themselves bonuses.  Defendants recognized
11 this fact in their discussions regarding the impending default in January 2013.  TNP's
12 legal counsel sent multiple emails to senior executives at both TNP and Breakwater
13 stating that "rents . . . represent proceeds of the real property which are technically the
14 [Plaintiff's] 'collateral.'"  Doc. 190-1 at 263, 267-68.  Based on this advice, TNP
15 required Breakwater to indemnify it for any claims arising out of the transfer of Rents
16 from the Operating Account to Breakwater.  *Id.*  TNP's counsel also recommended to
17 senior TNP executives that they set aside money to pay for legal fees likely to result from
18 the "impending default, and the possibility [TNP] will get a notice from lender re no
19 further use of rents[.]"  *Id.* at 267.[10]

---

[9] Defendants also argue the ALR does not give Plaintiff the right to collect Rents obtained prior to default, only those obtained after default.  Doc. 198 at 5.  Because the ALR granted Borrowers a license to collect Rents, Defendants assert that the Rents obtained prior to default are Borrowers' property and Rents collected thereafter are Plaintiff's property.  Defendants again read the Loan Documents too narrowly.  The ALR granted Borrowers a license to "collect and retain the Rents unless and until there shall be an Event of Default."  Doc. 191-1 at 176.  Once Borrowers defaulted, their right to collect and *retain* "any and all of the Rents" terminated.  *Id.* (emphasis added).  Plaintiff was entitled to collect all of the Rents retained by Borrowers regardless of when Borrowers collected them.

[10] Defendants argue that the Settlement Agreement shows that the Rents were the Borrowers' property because it provided that "[Borrowers] agree to direct [Breakwater] to pay to Plaintiff the sum of . . . $1,750,000.00 . . . from accounts held by Breakwater on behalf of the [Borrowers.]"  Doc. 185-2 at 42.  If Plaintiff was the true owner, Defendants argue, it would have directed payment of the funds.  But the language in the Settlement Agreement reflects nothing more than the practical reality of who was following whose

- 11 -

Defendants also argue that Arizona is a lien theory state and that Plaintiff's lien rights do not amount to legal or equitable title. Doc. 192 at 7. Defendants cite *Berryhill v. Moore*, 881 P.2d 1182, 1193 (Ariz. Ct. App. 1944), which confirms that Arizona is a lien theory state. But *Berryhill*, in addition to being more than 70 years old, is inapposite. It stands for the proposition that an action to quiet title cannot lie against a lienholder absent a default on the mortgage. *Id.* at 1192-94. It does not state that a party with a security interest in rents cannot maintain an action for conversion.

Finally, Defendants assert that a "triggering event" was required before Plaintiff was entitled to possession of the Rents, such as a demand or taking possession of the Property. Arizona law, however, does not require a demand from parties with a security interest because the secured party has an "immediate right to possession of the collateral upon default[.]" *Dayka & Hackett*, 269 P.3d at 716 (citing *Gehrke*, 91 P.3d at 365)). In addition, none of Defendants' cases concern conversion of rents and none applies Arizona law. They instead concern perfection of security interests for bankruptcy purposes, which is not an issue in this case. *See In re Sam A. Tisci, Inc.*, 133 B.R. 857, 859 (Bankr. N.D. Ohio 1991); *In re Pfleiderer*, 123 B.R. 768, 770 (Bankr. N.D. Ohio 1987); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981).

In sum, Defendants have failed to present any reason the Court should disregard the clear rights granted to Plaintiff in the Loan Documents. Those documents explicitly grant Plaintiff a security interest in all Rents subject to Borrowers' conditional license. Once Borrowers defaulted, the license was terminated and Plaintiff had the right to immediate possession of the Rents. This first element of conversion is satisfied.

### 2. Identifiable Money.

"[M]oney can be the subject of a conversion action if the funds can be described, identified or segregated and there is an obligation to treat the funds in a specific manner." *Koss Corp. v. Am. Express Co.*, 309 P.3d 898, 914 (Ariz. Ct. App. 2013) (citing *Autoville,*

---

directions during this litigation. The more significant fact from the settlement is that $1,750,000 was transferred to Plaintiff.

*Inc. v. Friedman*, 510 P.2d 400, 402 (1973)). Defendants do not dispute this element. The Rents were kept in separate accounts. *See* Doc. 205 at 5 ("All monies except the Flat Fee were held on the owners' behalf in segregated accounts and disbursed only as authorized and directed by their steering committed or outside counsel."); *see also John Deere Co. v. Walker*, 764 F. Supp. 147, 151 (D. Ariz. 1991) (finding that because "proceeds from the sale of the combines were put in a separate trust account[,] the proceeds were therefore described, identified, and segregated"). The second element of conversion is satisfied.

### 3.  Requisite Intent.

"Conversion also requires conduct intended to affect property of another." *Miller*, 104 P.3d at 203. "[T]he intent required is not necessarily a matter of conscious wrongdoing," rather it is the "intent to exercise a dominion or control over the goods which is in fact inconsistent with plaintiff's rights." *Matter of 1969 Chevrolet*, 656 P.2d 646, 650 (Ariz. Ct. App. 1982). TNP does not dispute that it intentionally made transfers of Rents from the Operating Account to Breakwater, and Breakwater does not dispute that it intentionally accepted such transfers and controlled the Rests in its accounts.

Both Defendants appear to argue that they were acting as agents of Borrowers and therefore did not intend to convert Plaintiff's Rents. Under Arizona law, however, a party cannot escape a claim for conversion merely because it was acting as an agent for a principal. *See Griffith v. Faltz*, 785 P.2d 119, 120-21 (Ariz. Ct. App. 1990) ("It is well-established law that an agent will not be excused from responsibility for tortious conduct because he is acting for his principal."). The court in *Griffith* explained "that whether an agent is acting on his own behalf or for another is immaterial to his liability for his violation of duties that he owes independently to third parties." *Id.* at 121. Nor can Defendants escape liability because they accepted transfer of the Rents in good faith. "Good faith belief or intention is no defense to a conversion action in Arizona." *See Focal Point*, 746 P.2d at 490 n.3

Defendants argue that although they may have exercised custodial control over the

- 13 -

1    Rents, Borrowers exercised actual dominion and control at all times. TNP, however,
2    admitted that it had control over the Operating Account (Doc. 189, ¶ 34; Doc. 190-1 at
3    46-47), and Breakwater does not dispute that it exercised control over the Rents it
4    received from TNP. Nor does either Defendant dispute that it held the Rents in accounts
5    under its own name that required its signature for withdrawal. Doc. 189, ¶¶ 83, 84;
6    Doc. 199, ¶¶ 83, 84; Doc. 206, ¶¶ 83, 84. Although an agent does not necessarily obtain
7    title to property held on behalf of a principal, the agent may still exercise control over the
8    property. *See Doane v. Espy*, 26 F.3d 783, 786-87 (7th Cir. 1994) (noting that although
9    the property belongs to the principal, an agent may have control over the property "at
10   some point in the process" and thus will "at some point . . . be in a position to wrongfully
11   divert [the property]"). Thus, although Defendants may have been acting at the direction
12   of Borrowers, they exercised control over the Rents by holding them in their own
13   accounts from which only they could make withdrawals or transfers.

14   The Court finds that Defendants possessed the requisite intent for conversion.
15   Even if they did not specifically intend to convert Plaintiff's Rents, they did intend that
16   the Rents be transferred out of the Operating Account and into Breakwater's accounts.
17   Thereafter, Breakwater intended to hold the Rents in its accounts. They discussed and
18   negotiated the transfer in emails with legal counsel who recognized that the Rents were
19   Plaintiff's collateral. This conduct significantly "affected the property" of Plaintiff and
20   the intent element of conversion is met. *See Miller*, 104 P.3d at 203. This element of
21   conversion is satisfied.

22              **4.     Degree of Interference.**

23   As noted above, in evaluating the degree of interference with a plaintiff's property,
24   courts look to the extent and duration of the control, the intent to assert a right
25   inconsistent with that of the other party's right of control, the harm done to the chattel,
26   the extent and duration of the interference, and the inconvenience to the other party.
27   *Focal Point*, 746 P.2d at 490 (citing Restatement (Second) of Torts § 222A(2)). Neither
28   Defendant analyzes these factors, nor do they argue that their interference with Plaintiff's

property was minimal.

Defendants' interference with Plaintiff's property was substantial. Defendants clearly intended to assert rights to the Rents inconsistent with Plaintiff's rights under the Loan Documents. Despite the fact that the Operating Account contained enough money to pay the monthly Loan installment and Defendants' knowledge that the Rents were Plaintiff's collateral, TNP did not pay the January Loan installment and transferred over $2 million dollars of Plaintiff's collateral to Breakwater. Instead of being used to pay Loan installments or provide collateral for Plaintiff, the funds were used to pay Breakwater's fee, TNP's finder's fee, and the Borrowers' legal fees, and this lawsuit was needed to recover Rents. This interference was serious enough to establish conversion.

### 5. Conclusion.

Plaintiff has established all of the elements necessary for conversion. There is no genuine dispute of fact that Plaintiff had the right to immediate possession of the Rents, the Rents were identifiable and segregated in specific accounts, Defendants intended to and did assert dominion and control over the Rents, and the resulting interference was of a serious nature. Summary judgment will be granted against TNP and Breakwater on Plaintiff conversion claim.[11]

### B. Fraudulent Conveyance.

Breakwater moves for summary judgment on Plaintiff's fraudulent conveyance claim. "Fraudulent conveyance may be shown by clear and satisfactory evidence of an 'actual intent to hinder, delay or defraud any creditor of the debtor' or of a debtor

---

[11] Defendants argue that Plaintiff ratified several expenditures from the Operating Account, including $55,000 retained by Borrowers' attorneys as part of the Settlement Agreement and $1,963,014.64 paid to Borrowers' attorneys from April 2013 to April 2014. Doc. 211 at 3. The Court disagrees. First, the Settlement Agreement makes no mention of a $55,000 payment to Borrowers' attorneys. Doc. 185-2 at 41-60. Second, "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Fid. & Deposit Co. of Maryland v. Bondwriter Southwest, Inc.*, 263 P.3d 633, 639 (Ariz. Ct. App. 2011) (internal quotation marks omitted). Ratification generally applies to principal-agent relationships and does not apply to Plaintiff's relation to Defendants. Even if it did, Defendants provide no evidence that Plaintiff took steps to ratify any transfers from the Operating Account. In fact, this lawsuit would suggest otherwise.

receiving no reasonable consideration for a transfer or obligation under certain circumstances." *Gerow v. Covill*, 960 P.2d 55, 63 (Ariz. Ct. App. 1998) (quoting A.R.S. § 44-1004(A)(1)). "Actual intent may be shown by direct proof or by circumstantial evidence from which actual intent may be reasonably inferred." *Id.* A.R.S. § 44-1004(B) lists several "badges of fraud" courts look to in determining whether actual intent exists in a suspicious transaction. *See Torosian v. Paulos*, 313 P.2d 382, 388 (Ariz. 1957).

Breakwater argues that Plaintiff has failed to provide clear and satisfactory evidence of its actual intent to hinder, delay or defraud. It further argues that Plaintiff has failed to establish that Borrowers received no reasonable consideration for the fee, as Breakwater assembled a ten-person team that worked 400-500 hours pursing workout options. Breakwater asserts that it provided substantial assistance in exchange for the $556,250 it received.[12]

As noted above, emails between TNP, Breakwater, and TNP's counsel recognized that the Rents were "technically Lender's collateral." Doc. 190-1 at 263. Breakwater even agreed to indemnify TNP for the transfer because it knew Plaintiff may file suit to recover the Rents. This evidence could support a finding that Breakwater knew the fund transfers would hinder Plaintiff's ability, as a creditor, to recover the amount of its outstanding Loan, and a finding of actual intent to hinder or delay Plaintiff in obtaining the collateral. This evidence creates a genuine dispute of fact that precludes summary judgment.

**IT IS ORDERED:**

1. Plaintiff's partial motion for summary judgment (Doc. 187) is **granted**.
2. TNP's motion for summary judgment (Doc. 184) is **denied**.
3. Breakwater's motion for summary judgment (Doc. 192) is **denied**.
4. On or before **May 15, 2015**, the parties shall file a joint memorandum

---

[12] Breakwater argues that Plaintiff cannot assert alternate claims for conversion and fraudulent conveyance because they are mutually exclusive. But Rule 8 allows pleading in the alternative even if the claims are inconsistent. *See CLN Props., Inc. v. Republic Servs., Inc.*, 688 F. Supp. 2d 892, 902 (D. Ariz. 2010).

describing the issues that remain in this case to be resolved at trial. The Court will then schedule a final pretrial conference, if needed.

Dated this 23rd day of April, 2015.

_____
David G. Campbell
United States District Judge